PATRIC HOOPER (State Bar No. 57343)
E-Mail: phooper@hooperlundy.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 551-8111

MARK A. JOHNSON (State Bar No. 191610)
E-Mail: mjohnson@hooperlundy.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
101 W. Broadway, Suite 1200
San Diego, California 92101-3890
Telephone: (619) 744-7300

JORDAN KEARNEY (State Bar No. 305483)
E-Mail: jkearney@hooperlundy.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
44 Montgomery Street, Suite 3500
San Francisco, California 94104
Telephone: (415) 875-8500

Attorneys for Plaintiff West Coast Wound and Skin Care, Inc.

**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| WEST COAST WOUND AND SKIN CARE, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT F. KENNEDY, JR., Secretary of the United States Health & Human Services,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF** |

Plaintiff West Coast Wound and Skin Care, Inc. ("WCW") alleges as follows:

**<u>INTRODUCTION</u>**

1. WCW is a Southern California-based wound care practice bringing the highest quality wound care directly to patients wherever they reside. Its main office

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

is in Burbank, California. WCW also operates dedicated wound care centers in select areas that provide the same caliber of care as its mobile services.

2. WCW's patients are among the most vulnerable individuals in the communities WCW serves. Many face significant mobility and transportation barriers, and many lack the regular caregiver or family support that recovery requires, often because of financial hardship. A substantial portion of WCW patients live in rural and hard-to-reach areas where wound care is otherwise unavailable. WCW built its program specifically for these vulnerable patients whose conditions range from chronic pain to life-limiting illness, many of whom carry twenty or more concurrent medical issues. Nearly all of WCW's patients present with chronic, non-healing wounds, including diabetic, venous, arterial, pressure, surgical, and traumatic wounds, and most are referred only after conservative treatment has failed. Each patient receives individualized, specialized care, and WCW's advanced treatment protocols routinely achieve healing in an average of three to four months across wound types—faster than these patients had previously experienced and at favorable rates compared to national benchmarks.

3. In the first nine months of this year alone, WCW cared for 9,347 patients and managed 27,475 wounds across twelve states. For most of these patients, there is no alternative healthcare. No comparable wound care group is positioned to accept or serve them, leaving them at heightened risk of untreatable infection, avoidable hospitalization, and diminished quality and length of life.

4. As required by the controlling Medicare statutes and regulations, Medicare routinely covered and promptly paid WCW for such services for years. However, this situation abruptly changed when Qlarant, a Medicare Unified Program Integrity Contractor ("UPIC") "employed" by the Secretary of Health and Human Services ("Secretary"), informed WCW by letter dated September 24, 2026 (Exhibit A hereto) that it had decided "to fully suspend Medicare payments to West Coast Wound and Skin Care, Inc.," effective **September 22, 2026**. Qlarant

purportedly did so based on "information" that WCW "misrepresented services billed to the Medicare program." According to this same notice, Qlarant alleges that from April 14, 2026 to April 16, 2026, "CMS received beneficiary complaints from Medicare beneficiaries who stated that they did not need and they did not receive the services billed to Medicare." These complaints were made via the "Medicare fraud hotline" and purportedly constitute reliable evidence of "fraud." However, in its September 24, 2026 notice (Exh. A), Qlarant, in fact, informed WCW of only two Medicare claims for a **single Medicare beneficiary for services furnished on July 14, 2025 and July 16, 2025.** And, notwithstanding, WCW's requests, Qlarant has refused to provide any further examples or information.

5. Because the majority of its patients are Medicare beneficiaries, this Medicare payment suspension is a "death penalty" for WCW. Indeed, if not enjoined, stayed, or vacated by this Court, WCW (a) will be forced out of business to the severe detriment of the thousands of Medicare beneficiaries it routinely treats as well as WCW's medical personnel, including doctors, physician assistants and nurse practitioners, and lay employees, and (b) will be denied due process of the law, among other legal rights.

6. Notwithstanding this imminent irreparable harm and the fact that WCW unconditionally disagrees with Qlarant's allegations of "fraud," Qlarant has only provided WCW with a single, unappealable administrative remedy to challenge the payment suspension – an opportunity to submit a "written rebuttal statement" within 15 business days of WCW's receipt of the notice during which time the payment suspension, which Qlarant retroactively implemented as of September 22, 2026, will remain in full effect. Exh. A, pages 1-2 of 3.

7. By letter dated October 15, 2026 (a copy of which is attached as Exhibit B, without the exhibits containing personal health information), WCW timely submitted its rebuttal statement. However, notwithstanding the fact the controlling Medicare regulation, 42 C.F.R. 405.375(a), mandates that Qlarant

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

respond in detail to the rebuttal statement within 15 calendar days of its receipt, Qlarant has failed to abide by this mandatory deadline.

8. As a result of Qlarant's unjustified and unlawful failure to comply with this mandatory deadline, and as well as the other unlawful actions and inactions, including a denial of due process of the law, WCW has been forced to initiate this action seeking immediate injunctive relief to prevent WCW and others from continuing to suffer irreparable harm due to the payment suspension.

## JURISDICTION

9. Based on the position the Secretary has taken in other "temporary" suspension cases, including, for example *Sinu-Clear v. Kennedy*, No. 25-cv-05599 (C.D. Cal. 2025), the Secretary will insist that WCW has no other administrative remedies. The typical administrative process to challenge claims denials under 42 C.F.R. §§ 405.901 et seq. does not begin until there has been an initial determination.

10. The Secretary takes the position that Qlarant's yet-to-be issued response to WCW's rebuttal statement is not an "initial determination," and thus, "is not appealable" under the Medicare administrative appeal process. According to the Secretary, an actual administrative appeal will only be available to WCW to challenge the payment suspension if Qlarant or another one of the Secretary's private contractors eventually issues an "initial determination" on specific claims imposing a Medicare overpayment. Thus, at this time, according to the Secretary, WCW has no further administrative appeal rights beyond the opportunity to submit its written rebuttal statement, and also has no right to judicial review of Qlarant's action, including a right to challenge the denial of due process and the failure to follow the time provisions governing responding to rebuttal statements. The Secretary will take this position despite the fact that the Secretary and his contractors are controlling the timing of events that would trigger the administrative appeal process. WCW's pursuit of the pending written-only rebuttal statement

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

process, itself, does not begin to satisfy the requirements of due process of the law, because it is neither timely nor does it provide WCW with an adequate or meaningful notice of "credible evidence of fraud."

11. As mentioned above, according to the Secretary, the only remedy a provider or a supplier whose Medicare payments have been temporarily suspended has is to await the issuance, if ever, of an "initial determination" of an overpayment notice by one of his private contractors. And, according to the Secretary, a provider or supplier must then fully exhaust its administrative appeal rights before it may seek any relief from the temporary suspension and/or overpayment determination in the district court. Until such exhaustion occurs, the Secretary contends a district court lacks subject matter jurisdiction to review the validity of a temporary suspension.

12. WCW disagrees with the Secretary's lack of jurisdiction argument. It contends this Court currently has jurisdiction to address and resolve its wholly collateral legal challenges to the validity of the temporary suspension, including but not limited to, its due process challenge to this administrative sanction. Indeed, to the extent further administrative appeal rights might exist at some point in the future, exhaustion of such further appeal procedures must be waived at this time under the circumstances here because WCW (a) has presented its constitutional and other legal claims to the defendant Secretary through the submission of its rebuttal statement, (b) the constitutional and other issues raised by this action are "wholly collateral" to any overpayment determination, and (c) the pursuit of the purely legal issues through further administrative appeal processes would be an exercise in futility given the fact that the Secretary's adjudicators are prohibited from deciding the legal issues raised in this complaint. Moreover, under 28 U.S.C. § 1361, this Court has the authority to require the Secretary to comply with the mandatory obligations at issue, including the mandatory requirements of due process of the law and timing requirements of the controlling regulations.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

13. As indicated above, WCW timely submitted a rebuttal statement challenging the sanctions imposed by CMS (Exh. B). WCW's request satisfies the "presentment" requirement necessary for the Court to assume subject matter jurisdiction over this matter under 42 U.S.C. §§ 1395ff and/or 1395cc. And, as explained above, the Court should waive any requirement for the further exhaustion of additional administrative remedies to address and resolve WCW's due process claims, consistent with the recent decision in *Lee v. Kennedy*, No. 26-1820, 2026 WL 2719093 (9th Cir. Sept. 15, 2026) ("*Lee*"), in which the Ninth Circuit concluded, under circumstances similar to those here, that "exhaustion of remedies [was] futile as to [plaintiff's] due process claim," and therefore reversed and remanded the due process claim to the district court to decide. *See Lee* at *2. Pursuit of further administrative appeal procedures will be an exercise in futility. And, as long as the sanctions remain in effect, which will be the case throughout any administrative appeal process, WCW and others, including its patients, will suffer irreparable harm. In short, judicial review must be presumed to exist under the circumstances of this case. And, such review should be conducted under the provisions of the Administrative Procedure Act, 5 U.S.C. § 706.

## THE PARTIES

14. WCW's principal office is located in Burbank, California. As stated above, WCW is a wound care practice bringing quality wound care directly to patients who have significant mobility and transportation barriers wherever they reside, in addition to operating dedicated wound care centers in select areas that provide the same caliber of care as its mobile services. WCW has been certified to participate in the Medicare Program as a "supplier" of medical services for several years.

15. WCW's founder, Dr. David Kay, is fellowship-trained in Geriatric Medicine and in Palliative and Hospice Care at the world-renowned UCLA Medical Center. He earned his Doctor of Osteopathic Medicine degree from the Western

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

University of Health Sciences—College of Osteopathic Medicine of the Pacific, and then completed his Family Medicine Residency at Dignity Health Northridge Hospital Medical Center from 2014 through 2017. Dr. Kay maintains active affiliations with respected hospitals throughout Southern California including: Community Hospital of Huntington Park, East Los Angeles Doctors Hospital, Memorial Hospital of Gardena, Mission Community Hospital, Los Angeles Community Hospital, Southern California Hospital at Culver City, and Southern California Hospital at Hollywood.

16. The defendant Secretary administers the Medicare Program. He does so on a daily basis through the Centers for Medicare and Medicaid Services ("CMS"), a government subagency within the Department of Health and Human Services. CMS, in turn, uses private contractors, such as UPICs, to perform some payment functions, including reviewing bills submitted by Medicare providers. The Secretary's Office of Inspector General ("OIG") and the CMS Medicare Integrity Program scrutinize, among other things, Medicare suppliers' and providers' compliance with the applicable Medicare rules and regulations.

## THE RELEVANT MEDICARE PRINCIPLES

17. Medicare, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., is the federal healthcare program for the aged and disabled. Part A of program covers inpatient healthcare services furnished to Medicare beneficiaries through institutional providers such as hospitals and skilled nursing facilities. Medicare Part B is the Medicare Supplementary Medical Insurance Program, which covers services furnished by physicians and other health care professionals. *See* 42 U.S.C. §§ 1395x(q) and (s).

18. Congress has authorized the Secretary, through CMS, to contract with private entities, known as Medicare Administrative Contractors ("MACs"), to administer particular payment functions of the Medicare Part B program. 42 U.S.C. §§ 1395u and 1395kk-1. To facilitate the cash flow necessary for providers to

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

continue to furnish services, the MACs are required to promptly pay providers for their services. 42 U.S.C. § 1395u(c). MACs are also required to furnish education and technical assistance to providers. 42 U.S.C. § 1395kk-1(a)(4)(F) and 42 U.S.C. § 1395zz(g).

19. Under 42 U.S.C. § 1395ddd, the Secretary enters into separate contracts with other private contractors, including UPICs like Qlarant. These Medicare Integrity Program contractors perform utilization and fraud and abuse reviews. And, they often work together with the OIG. For example, UPICs must agree to provide the OIG with performance statistics (including the number of fraud referrals and "the return on investment" of their activities). 42 U.S.C. § 1395ddd(c)(4). Indeed, UPICs are eligible for "performance-based award fees" based on such statistics. *See* "UPICs Hold Promise to Enhance Program Integrity Across Medicare and Medicaid, But Challenges Remain," published by the OIG in September 2022, excerpted and attached as Exhibit C.

20. Pursuant to 42 U.S.C. § 1395y(o), Congress has authorized "the Secretary" to suspend Medicare payments to a provider "pending an investigation of a credible allegation of fraud" against the provider. In doing so, the "Secretary shall consult with" the OIG "in determining whether there is a credible allegation of fraud against a provider or supplier." 42 U.S.C. § 1395y(o). This same statute further states that a "fraud hotline tip" without further evidence is **not** sufficient evidence to establish a credible allegation of fraud. 42 U.S.C. § 1395y(o)(4). Under subsection (o)(3) of this same statute, Congress requires the Secretary to "carry out" Section 1395y(o) through the promulgation of regulations. Section 1395y(o), the controlling Medicare statute, does **not** give **UPICs** the authority to suspend payments to a Medicare provider based on credible allegations of fraud or otherwise. Indeed, Section 1395y(o) does not even mention UPICs. Nor, for that matter, does 42 U.S.C. § 1395ddd give UPICs the authority to impose Medicare payment suspensions. Rather, Section 1395ddd(f) only gives a UPIC or other program

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

integrity contractors the power to conduct audits of providers and assess and recover overpayments.

21. On February 2, 2011, the Secretary, through CMS, promulgated amended regulations purporting to "carry out" and implement the payment suspension provisions of 42 U.S.C. § 1395y(o). 76 Fed. Reg, 5862, 5928-5931, 5961 (Feb. 2, 2011). Unlike the statute, the regulations allow a "Medicare contractor" as well as CMS to implement a payment suspension in cases of suspected fraud. *See* 42 C.F.R. § 405.371(a). Exceptions exist for situations in which beneficiary access would be jeopardized. 42 C.F.R. § 405.371(b)(ii). Under 42 C.F.R. § 405.372(a)(4), the contractor, after consulting with the OIG and/or the Department of Justice, may implement a payment suspension without giving a provider any prior notice of such intended action. Under Section 42 C.F.R. § 405.372(b)(2), if prior notice of the suspension is not given to the provider, the Medicare contractor must nevertheless give the provider an opportunity to submit a rebuttal statement as to why the suspension should be removed. Under subsection (d), the payment suspension is for 180 days but can be extended for another 180 days or until the investigation is completed. Section 405.375 subsections (a) and (b) **require** the Medicare contractor to send the provider its written response to the provider's rebuttal statement within 15 days of receipt of the rebuttal statement. The response must contain specific findings on the conditions upon which the suspension may be continued or removed and "an explanatory statement of the determination." Under 42 C.F.R. § 405.375(c), the contractor's determination is "not an initial determination and is not appealable."

22. In responding to comments objecting to the payment suspension regulation, CMS indicated that it was "mindful of the impact that payment suspension may have upon a provider" (76 Fed. Reg. at 5929), yet it rejected commenters' due process concerns (76 Fed. Reg. at 5930-31). And, CMS' disregard of due process issues with respect to Medicare payments suspensions is reflected

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

most recently in an October 2026 presentation by Deputy CMS Administrator Kim Brandt who "hopes" that the number of suspensions "will Quadruple over the course of the next six months" due to "technology-enabled" reviews using artificial intelligence.[1]

23. Not only must UPICs send copies of fraud suspensions to the OIG, FBI and AUSAs in matters in which law enforcement has been previously involved or has active investigations of providers or suppliers, UPICs also must report Medicare payment suspensions to the "Unified Case Management System," which is a national data base used by UPICs to enter and track payment suspension investigations, among other activities. Significantly, this national data bank is accessible to numerous other government agencies and "other federal and state partners seeking to address program integrity concerns in judicial or state health care programs." UPICs must update their activities to substantiate allegations of potential fraud, waste or abuse. *See* Medicare Program Integrity Manual, Chapter 4, section 4.12. Copy attached as Exhibit D. Federal and State partners include, among others, private healthcare insurers, which contract with the Secretary to act as Medicare Advantage plans under Parts C and D of the Medicare program. The access to the data bank information thus allows these private companies to use such investigational information to sanction doctors and suppliers in connection with their provision of healthcare services to private pay patients. If not enjoined, this broad reporting of "credible evidence allegations of fraud" by WCW will necessarily continue to have a substantial impact on its reputation for honesty and integrity.

/ / /

---

[1] *See* Naomi Diaz, *CMS official wants to quadruple provider suspensions in 6 months*, BECKER'S HOSP. REV. Oct. 16, 2026, https://www.beckershospitalreview.com/finance/cms-wants-to-quadruple-provider-suspensions-in-6-months/.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

## THE RELEVANT FACTS

24. As indicated above, Qlarant informed WCW on September 24, 2026 that its Medicare payments were being fully suspended effective two days earlier on September 22, 2026, based on hotline tip allegations of fraud. Qlarant contends that WCW billed Medicare for services that it did not provide to a beneficiary, including two claims for this same beneficiary, which were identified by two claim control numbers. Qlarant further informed WCW of its right to submit a rebuttal statement. While the stationery used by Qlarant on its notice includes reference to "CMS," the letter itself was from Qlarant, the UPIC, as shown at the bottom of the first page of the notice. *See* Exhibit A.

25. On October 15, 2026, WCW submitted a detailed rebuttal statement, together with supporting clinical documentation, showing that it furnished medically necessary services to the two claims for a single identified beneficiary listed as examples in Qlarant's suspension notice. Exhibit B. For both claims, WCW billed Medicare in relation to wound care provided by a nurse practitioner who was supervised by a physician. WCW reasonably believed it could report the services under the name and NPI of the supervising physician consistent with the Medicare incident-to billing rule. *See* 42 C.F.R. § 410.26. The care was provided in a noninstitutional setting, as an integral, though incidental, part of the service, which was directed by a physician in the course of treatment of an injury, and furnished under the direct supervision of a physician. *Id.* During the public health emergency and thereafter, the requirement within the incident-to rule that direct supervision be provided in the office was waived, and providers were permitted to perform such supervision using telecommunications technology.[2]

[2] *See* Medicare and Medicaid Programs; Policy and Regulatory Revisions in Response to the COVID-19 Public Health Emergency, 85 FR 19230, 19245 (Vol. 85, No. 66, April 6, 2020). Such supervision was subsequently made permanent for certain services. 90 Fed. Reg. 49266, 49326-49328 and 50007 (Nov. 5, 2025).

26. WCW believed that a mid-level provider functioning under the general direction and supervision of a physician was sufficient to meet the physician-initiation-of-care element of the incident-to rule. Regardless, the responsible nurse practitioner was duly credentialed with the Medicare program and authorized in the practitioner's own right to report the services for reimbursement. Thus, if the claims should have been billed under the nurse practitioner or physician assistant's NPI rather than under a physician's NPI, Medicare would have reimbursed WCW at approximately 85% of the physician fee schedule allowance. *See* 42 C.F.R. §§ 414.52, 414.56.

27. Even if there were arguably a technical error in the identification of the "rendering provider," the mistake had nothing to do with the services furnished to each patient nor the medical necessity of those services. Rather, any good-faith billing errors associated with the highly complex and technical Medicare rules do not amount to fraud.

28. Qlarant submitted no evidence of any actual complaints by any of the patients with its Notice of Suspension. Moreover, Qlarant presented no proof that it consulted with the OIG or the Department of Justice. Instead, in footnote 1 of its notice, it simply says the OIG and the Department of Justice "are consulted in all cases of suspected fraud." *See* Exhibit A. In essence, the suspension notice consists of conclusory, "boilerplate" language.

**<u>QLARANT'S ACTIONS ARE UNLAWFUL</u>**

29. The September 22, 2026 suspension of payment denies WCW due process of the law. Due process of the law requires that a person be afforded a meaningful notice and opportunity to be heard prior to being deprived of life, liberty or property. While a Medicare provider might not have a property right to continued participation in the Medicare Program, a provider's liberty interest is implicated, invoking procedural due process protections, where (a) the government makes a "charge" that impairs the provider's reputation for honesty or morality, (b)

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

the accuracy of the charge is disputed, and (c) there is some public disclosure of the charge. Each of these elements is present here.

30. Defendant Secretary provided WCW with no **meaningful** opportunity to be heard to challenge the charges being made against it. The September 24, 2026 notice (Exh. A) does not provide adequate or meaningful notice of any wrongdoing, because it does not provide or identify any factual basis for the purely conclusory, damning statement that WCW never provided services for which it billed. And, the written-only rebuttal process provides no opportunity to obtain the factual basis for the conclusory statement and no opportunity to examine witnesses and other meaningful due process protections prior to the implementation of the very serious sanctions imposed on WCW, including its suspension from Medicare. The suspension at issue thus deprives WCW of due process of the law. At a minimum, CMS should have provided WCW with adequate notice and a meaningful opportunity to be heard to refute the allegations against it **before** CMS suspended Medicare payments to WCW.

31. Qlarant's payment suspension is tantamount to an indefinite debarment and deprives WCW of its property and its liberty interest in protecting its reputation for honesty and integrity. It also constitutes a "taking" of WCW's property in violation of the Fifth Amendment to the Constitution. At a minimum, the Secretary should have required Qlarant to give WCW adequate notice and a meaningful opportunity to be heard to refute the "fraud" allegations **before** it implemented the payment suspension. It did neither.

32. Under the Administrative Procedure Act, 5 U.S.C. §558(b), an agency may only impose a sanction on a private party if Congress has given the agency the express authority to do so. As discussed above, Congress did not provide express statutory authority for a UPIC to impose a Medicare payment suspension, which constitutes a sanction under 5 U.S.C. § 551(10), and thus, this Court must set aside the payment suspension under 5 U.S.C. § 706.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

33. In any event, Congress lacked the authority under the Constitution to delegate to a private contractor the immense power to impose a Medicare payment suspension on a provider. This is especially the case where, as here, the private party, Qlarant, stands to benefit economically from the volume of its fraud allegations and referrals. Providing Qlarant personnel with such authority also violates the Appointment Clause of the Constitution.

34. Qlarant's failure to furnish WCW with a timely response to WCW's rebuttal statement clearly violates the provisions of 42 C.F.R. § 405.375, thus requiring the Court to invalidate the payment suspension. And neither the Secretary nor Qlarant should be allowed a "do-over" under these circumstances.

**WCW, ITS PATIENTS, AND OTHERS**
**WILL SUFFER IRREPARABLE HARM IF**
**THE PAYMENT SUSPENSION IS NOT SET ASIDE**

35. Because WCW furnishes wound care services to thousands of Medicare beneficiaries on an ongoing basis, its financial viability is dependent on being paid promptly by Medicare for the services it furnishes. Medicare revenues constitute the majority of its revenues. Given its costs of operating, it cannot continue to serve its patients, if the full Medicare payment suspension remains in effect. While it has already begun laying off some employees to reduce overhead expenses, WCW is unlikely able to remain operating and providing services to its patients if the payment suspension remains in effect. The services furnished by WCW are critical to the well-being and health of its patients. Moreover, as revenues continue to be suspended, more of WCW's employees and professionals will have to be laid off causing them irreparable harm. Finally, WCW's reputation for honesty and integrity in the healthcare community continues to suffer as a result of the unfounded allegations of fraud, which has been reported by Qlarant to the Unified Case Management System and is thus readily accessible to various entities and persons who are in a position to sanction WCW based on Qlarant's "credible

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304

allegation of fraud."

## THE RELIEF REQUESTED

36. Immediate injunctive is necessary to protect against the irreparable harm being suffered by WCW and third parties, including Medicare beneficiaries.

## PRAYER

Wherefore WCW prays as follows:

1. For an order preliminarily and permanently enjoining the Secretary and his agents, including Qlarant, from continuing to impose the payment suspension;

2. For an order setting aside the September 24, 2026 payment suspension notice and decision and returning and paying the sums owing for the services adversely affected by the payment suspension;

3. For costs of suit; and

4. For such other and further relief as the Court deems to be just and appropriate.

DATED: November 2, 2026

HOOPER, LUNDY & BOOKMAN, P.C.

By: *s/ Patric Hooper*

PATRIC HOOPER
MARK A. JOHNSON
JORDAN KEARNEY

Attorneys for Plaintiff West Coast Wound and Skin Care, Inc.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067
TEL (310) 551-8111 • FAX (310) 551-0304